**TOWN OF ACTON et al.**

v.

**Carroll R. McGARY et al.**

Supreme Judicial Court of Maine.

April 29, 1976.

Verrill, Dana, Philbrick, Putnam & Williamson by: Michael T. Healy, P. Benjamin Zuckerman, Portland, for plaintiffs.

David M. Roseman, Harrison W. Wetherill, Jr., Jerome S. Matus, Asst. Attys. Gen., John W. Benoit, Jr., Deputy Atty. Gen., Augusta, for defendants.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK and ARCHIBALD, JJ.

WERNICK, Justice.

A Justice of the Superior Court (Kennebec County) has reported this case to us, pursuant to Rule 72 M.R.C.P.,

" . . . upon the pleadings, agreed statement of facts . . . and upon so much of the evidence produced . . . as is legally admissible",

and we are to

" . . . render such decision as the rights of the parties require."

The plaintiffs in the action are 31 municipalities of the State of Maine[1] and also 2 individual persons, Walter S. Reed, Jr., and E. Ward Logan, who live, own real property and pay taxes thereon in the Town of Boothbay Harbor (one of the plaintiff municipalities).

The original defendants in the action were the State Board of Education; Carroll R. McGary, Commissioner of Educational & Cultural Services; Ernest H. Johnson, State Tax Assessor; Norman K. Ferguson, Treasurer of State and Jon A. Lund, Attorney General (whom the plaintiffs saw fit to join as a party defendant because the action attacks the constitutionality of a statute).[2] Since various of the

1. The plaintiff municipalities are: Acton, Baileyville, Boothbay, Boothbay Harbor, Bowerbank, Bremen, Brooksville, Brooklin, Castine, Centerville, Cranberry Isles, Damariscotta, East Millinocket, Georgetown, Harpswell, Isle Au Haut, Islesboro, Jay, Monhegan, Mount Desert, Nashville Plantation, North Haven, Pleasant Ridge Plantation, Raymond, Sorrento, South Bristol, Southport, Trenton, Wells, Wiscasset and York.

2. In this context 14 M.R.S.A. § 5963 and Rule 24(d) M.R.C.P. require that the Attorney General be given notice. In addition, the statute provides that the Attorney General "be entitled to be heard", and the Rule states that the Attorney General may "intervene for presentation of evidence . . . and for argument of the question of constitutionality."

aforesaid public officials have ceased to serve in the several offices above described, under Rule 25(d) M.R.C.P. the present holders of the offices are substituted as parties defendant, namely: H. Sawin Millett, Jr., Commissioner of Educational & Cultural Services; Raymond L. Halperin, State Tax Assessor; Rodney L. Scribner, Treasurer of State; and Joseph E. Brennan, Attorney General.

The instant proceedings were commenced on April 12, 1974 when plaintiffs filed their complaint seeking a declaratory judgment that the State property tax levied pursuant to Chapter 556, P.L.1973—"AN ACT Equalizing the Financial Support of School Units"—be held null and void on the ground that its provisions for the determination of the tax rate involved a delegation of legislative power violative of Article III and Article IX, Section 9 of the Constitution of Maine.[3]

In attacking the State property tax as unconstitutional plaintiff municipalities simultaneously seek to nullify the obligation imposed upon them by the State property tax statute to pay over to the Treasurer of State particular proceeds of the State property tax, i. e., that portion not allocated for local school purposes (as more fully explained infra). Accordingly, during the course of the litigation, under date of Au-

gust 1, 1974, plaintiff municipalities and the State established an escrow agent to receive these monies from the plaintiff municipalities. In this manner, the municipalities aimed to avoid the risk that if they paid the monies in dispute to the Treasurer of State, to avoid penalty for delinquency, they might foreclose their opportunity to challenge the State's asserted right to payment.

After various of the plaintiff municipalites had made deposits of monies with the escrow agent, plaintiff municipalities amended the complaint to add a claim that if the challenged statute be declared unconstitutional, the Court should order

". . . all proceeds held pursuant to the Escrow Agreement . . . paid or remitted . . ."

to the several plaintiff municipalities which had made the deposits.

Discharging responsibilities under the statute here at issue, as effective January 1, 1974, (1) on February 27, 1974 the Commissioner of Educational & Cultural Services certified to the State Tax Assessor the estimated public school costs for 1973–1974; (2) on March 14, 1974 the State Board of Education approved the Commissioner's estimate;[4] and (3) during

3. Article III of the Maine Constitution provides:

"*Section 1.* The powers of this government shall be divided into three distinct departments, the legislative, executive and judicial.

"*Section 2.* No person or persons, belonging to one of these departments, shall exercise any of the powers properly belonging to either of the others, except in the cases herein expressly directed or permitted."

Article IX, Section 9 of the Maine Constitution reads:

"The Legislature shall never, in any manner, suspend or surrender the power of taxation."

4. These actions were taken pursuant to Section 6 of Chapter 556, P.L.1973 which had repealed the then Section 451 of 36 M.R.S.A.

and replaced it with a new Section 451 reading:

"The Commissioner of Educational and Cultural Services, with the approval of the State Board of Education, shall annually, prior to February 15th, certify to the State Tax Assessor 50% of the estimated total public school education costs in 1973–74 and thereafter, for the current school year to be completed. For the necessary expenses of local and state government, a tax is assessed at a rate that is equivalent to 50% in 1973–74 and thereafter, of the estimated total state public school education costs divided by the total of the most recent state valuation adjusted upward to the nearest quarter mill as filed under section 381 to 100% valuation plus 7¾ mills on the dollar applied to a 100% valuation for the property tax year commencing April 1, 1974; 9¼ mills effective April 1, 1975;

February and March of 1974 the other public officials required to act made the computations necessary to estimate, subject to later adjustments, the amounts to be allocated to the various municipalities for such school purposes as were *local* in respect to each municipality.[5]

At the 1974 First Special Session of the 106th Legislature, Chapter 783, P.L. 1973 was enacted effective as emergency legislation on April 1, 1974. Section 45 thereof repealed the Section 451 (of 36 M. R.S.A.) which had been in effect since

> 10¾ mills effective April 1, 1976; 12¼ mills effective April 1, 1977; and 13¾ mills effective April 1, 1978 and every year thereafter upon each municipality, township and each lot and parcel not included in any township in the State. In any event, such rate shall never exceed whatever shall from time to time be the weighted average municipal tax rate. The 'weighted average municipal tax rate' means the total municipal property taxes levied state-wide for the previous year, as determined by the State Tax Assessor from the annual return of municipal assessors pursuant to section 383, divided by the state valuation of municipalities in effect for the previous year adjusted to a 100% basis. The valuation as determined by the State Tax Assessor, as set forth in the statement filed by him as provided by section 381, shall be the basis for the computation and apportionment of the tax assessed."

5. These estimates of the amounts allocated for local school purposes were made pursuant to Section 1 of Chapter 556, P.L.1973 which had amended 20 M.R.S.A. to add a new Chapter 510 in which was included a Section 3713 providing for the "computation of unit allocations."

6. This new Section 451 (of 36 M.R.S.A.) as effective April 1, 1974 provided:
   "For necessary expenses of local and State Government, a tax is assessed at the rate of 14¾ mills on the dollar applied to a 100% valuation for the property tax year commencing April 1, 1974, 9¼ mills effective April 1, 1975, 10¾ mills effective April 1, 1976, 12¼ mills effective April 1, 1977, and 13¾ mills effective April 1, 1978, and every year thereafter upon each municipality, township and each lot and parcel of land not included in any township in the State.

January 1, 1974 (by virtue of Section 6 of Chapter 556, P.L.1973) and replaced it with a new Section 451.[6]

Pursuant to this legislation, the State Tax Assessor in April of 1974 established a State property tax rate of 21¾ mills consisting of the 14¾ mills directly fixed by the statute and an additional 7 mills as determined by the State Tax Assessor on the basis of computations in accordance with the statutory prescriptions relative to that part of the State property tax denominated as the "additional school" tax.

"In addition to the above, a school tax is assessed which shall be determined as follows: The Commissioner of Educational and Cultural Services with the approval of the State Board of Education shall annually, prior to February 3, certify to the State Tax Assessor the estimated total public school education costs for each school year, July 1st to June 30th. A tax is assessed at a rate that is equivalent to 25% of the estimated total state public school education costs as certified by the commissioner, divided by the total of the most recent state valuation adjusted upward to the nearest ¼ mill as filed under section 381 at 100% state valuation for the tax year 1974. Thereafter, a tax is assessed at a rate that is equivalent to 50% of the estimated total state public school education costs as certified by the commissioner, divided by the total of the most recent state valuation adjusted upward to the nearest ¼ mill as filed under section 381 at 100% state valuation.

"The State Tax Assessor shall determine the tax rate and the amount to be assessed upon each municipality, township and lot and parcel of land not included in any township in the State. In any event, such rate shall never exceed whatever shall from time to time be the weighted average municipal tax rate. The 'weighted average municipal tax rate' means the total municipal property taxes levied statewide for the previous year, as determined by the State Tax Assessor from the annual return of municipal assessors pursuant to section 383, divided by the state valuation of municipalities in effect for the previous year adjusted to a 100% basis. The valuation as determined by the State Tax Assessor, as set forth in the statement filed by him as provided by section 381, shall be the basis for the computation and apportionment of the tax assessed."

Further, in accordance with the statutory directive that the State Tax Assessor shall determine not only the rate of the State property tax but also the "amount to be assessed upon each municipality . . .", the Assessor made such determination.

7. Section 7 of Chapter 556, P.L. 1973 had repealed the then existing Section 453 of 36 M.R.S.A. and replaced it with a new Section 453 reading:

"The Treasurer of State, in his said warrants, shall require the said mayor and aldermen, selectmen or assessors, respectively, to pay or to issue their several warrants requiring the collectors of their several municipalities to collect and to pay to the treasurers of their respective municipalities the sums against said municipalities required by this subchapter.

"Said municipal treasurer shall pay to the Treasurer of State a sum equivalent to that portion of the tax levied under section 451 which is based upon a percentage of public school education costs which exceeds the allocation to the unit as computed under Title 20, section 3713. Said municipal treasurer shall pay to the treasurer of the School Administrative District or community school district in quarterly installments that portion of the tax levied under section 451 of public school education costs which is not in excess of the allocation to the unit as computed under Title 20, section 3713.

"The balance of the sums so assessed in each municipality shall be disbursed by the treasurer thereof for necessary expenses of local government as determined or appropriated for the public welfare within the purposes specified in Title 30, which Title sets forth these purposes for the public welfare for which municipalities are themselves authorized to raise money by taxation. For the year 1974, the municipal treasurer shall pay ½ the sum provided for in this section to the Treasurer of State. Payments in 1974 shall be in 2 equal installments payable on or before the last day of September and the last day of December. For the year 1975 and thereafter, payments shall be made to the Treasurer of State in equal quarterly installments payable on or before the 15th day of March, June, September and December."

8. This new Section 453 effective April 1, 1974 provided:

"The Treasurer of State, in his said warrants, shall require the said mayor and aldermen, selectmen or assessors, respectively, to pay or to issue their several war-

By virtue of Section 46 of the aforesaid emergency legislation another change in the law went into effect on April 1, 1974. Section 453 (of 36 M.R.S.A.), as it had been law since January 1, 1974 (under Section 7 of Chapter 556, P.L.1973),[7] was repealed and replaced by a new Section 453.[8]

rants requiring the collectors of their several municipalities to collect and pay to the treasurers of their respective municipalities the sums against said municipalities required by this subchapter. The municipal treasurer shall pay to the treasurer of the School Administrative District or community school district in quarterly installments that portion of the school tax, levied under section 451, of public school education costs which does not exceed the municipalities share of the allocation as adjusted to the unit by the computation under Title 20, section 3713. The Commissioner of Educational and Cultural Services shall annually, on or before February 15th, notify the municipal officers of the amount of the school tax, if any, which shall be paid to the Treasurer of State. Said municipal treasurer shall pay to the Treasurer of State a sum equivalent to that portion of the school tax levied under section 451 which exceeds the allocation and adjustments to the unit as computed under Title 20, section 3713. Payments in 1974 of the sums certified by the Commissioner of Educational and Cultural Services shall be paid to the Treasurer of State in 2 equal installments payable on or before the last day of September and the last day of December. For the year 1975 and thereafter, payments shall be made to the Treasurer of State in semi-annual installments payable on or before the 15th day of June and December. The Commissioner of Educational and Cultural Services shall notify the municipal officers of each unit of any necessary change in such payment resulting from adjustments in the State and local allocation.

"The Commissioner of Educational and Cultural Services shall, on or before February 15th, notify the municipal officers of the amounts of the school tax, if any, which may be retained for municipal use under the provisions of Title 20, section 3713, subsection 3, paragraph E, which sums shall be disbursed by the municipal treasurer for the necessary expenses of local governments as determined or appropriated within the purposes specified in Title 30.

"The tax assessed under the first paragraph of section 451 in each municipality shall be paid when collected to the treasurer thereof to be by him disbursed for neces-

Pursuant thereto, on April 18–20, 1974 (one week after the present litigation had been instituted), the Treasurer of State issued warrants requiring the appropriate local officials of the various municipalities, including the plaintiff municipalities,

> ". . . to issue their several warrants requiring the collectors of their several municipalities to collect and pay to the treasurers of their respective municipalities the sums against said municipalities . . ."

as had been determined by the State Tax Assessor.

These sums were in fact subsequently collected and paid over to the respective treasurers of the plaintiff municipalities. Said treasurers deducted from these monies the amounts allocated for use for local school purposes, as determined pursuant to 20 M.R.S.A. § 3713 (discussed ante). The remaining monies collected were deposited in the escrow account to await the outcome of this litigation.[9]

By an amendment to their answer defendants included therein a motion for dismissal of this action as to the plaintiff municipalities on the grounds that:

> ". . . plaintiff municipalities are not taxpayers;

> ". . . plaintiff municipalities, pursuant to 36 M.R.S.A. § 453, collected the tax now alleged by them in this action to be unconstitutional from the individual taxpayers;

> ". . . plaintiff municipalities retained a portion of the tax so collected by them for local school purposes;

> ". . . plaintiff municipalities have made no effort to return any of the

school tax collected by them pursuant to 36 M.R.S.A. § 453 to the individual taxpayers;

> ". . . plaintiff municipalities are not aggrieved by the setting of the tax rate pursuant to 36 M.R.S.A. § 451, which they allege to be an unconstitutional delegation of authority;

> ". . . plaintiff municipalities do not properly represent the interests of the individual taxpayers who might be aggrieved by an unconstitutional tax rate."

We decide that the action must be dismissed not only as to the plaintiff municipalities but also as to the two other plaintiffs, Walter S. Reed, Jr., and E. Ward Logan, inhabitants and taxpayers of the Town of Boothbay Harbor.

As owners of "estates" situated in the Town of Boothbay Harbor plaintiffs Reed and Logan had voluntarily paid the amounts, relative to the State property tax, sought to be collected from them by the tax collector of Boothbay Harbor. For this reason, regardless of whether the State property tax be constitutional or unconstitutional, under the precedents of *Exxon Corporation v. King*, Me., 351 A.2d 534 (1976) and *Berry v. Daigle*, Me., 322 A.2d 320 (1974), plaintiffs Reed and Logan are not entitled to be repaid, in whole or in part, the monies voluntarily paid by them as taxes. The instant complaint must, therefore, be dismissed as to them because it fails to state a claim upon which they may be granted relief.

As to the 31 municipalities which are the other plaintiffs, we conclude that they can gain no benefit under the law, in terms of the particular interests they may here assert as entitled to protection, from an adju-

---

sary expenses of local government as determined or appropriated by the legislative body of such municipality within the purposes specified in Title 30."

**9.** The Town of Wiscasset did not follow this procedure. It paid the aforesaid differential directly to the Treasurer of State, transmitting $162,254.50 on October 1, 1974 and $162,254.50 on January 14, 1975.

dication of the constitutionality of the State property tax. Accordingly, since that is the only issue the complaint of plaintiff municipalities posits for decision, we must dismiss the complaint as to the plaintiff municipalities because it fails to state a claim entitling them to relief.

■ The plaintiff municipalities here purport to assert an interest warranting judicial protection on the basis that the municipalities are the *taxpayers* of the State property tax. The municipalities contend that the statute they challenge requires that the State Tax Assessor

". . . shall determine . . . the amount to be *assessed* upon each municipality, township and lot and parcel of land not included in any township in the State." (emphasis supplied)

That the Legislature thus carefully provided for assessment of the State property tax directly upon land which is not within the confines of any township but as to any other land required that the amount of State property tax be assessed upon the "municipality" or "township" makes plain, say the plaintiff municipalities, that the State levied the State property tax upon the plaintiff municipalities in such manner as to establish them, as corporate entities, the taxpayers.

We find this argument without merit.

■ As a *property* tax, the State property tax has been deemed subject to the mandates of Article IX, Section 8 of the Constitution of Maine as concerned with

"[a]ll taxes upon real and personal *estate*, assessed by authority of this State . . . ." (emphasis supplied)

See: *Opinion of the Justices*, Me., 339 A. 2d 492, 510 (1975). Thus, the State property tax, as a tax on *property*, is a tax laid

upon the *estates* of persons located within the boundaries of the several municipalities, and it is the *persons who own the estates* within the plaintiff municipalities who are the taxpayers of the State property tax, *not* the plaintiff municipalities as corporate entities.[10]

■ The correct interpretation of the statutory requirement that the State Tax Assessor shall

"determine . . . the *amount* to be *assessed* upon each municipality . . . ." (emphasis supplied)

is that the State Tax Assessor determines the monetary quotas which the several municipalities have responsibility to collect from the owners of estates situated within their respective boundaries, the owners of such estates being the taxpayers.

This legislative intendment appears most plainly in the further statutory specification that after the State Tax Assessor has determined the total amount which is each municipality's quota, the Treasurer of State is to issue warrants for the appropriate municipal officials to require

". . . the *collectors* of their several municipalities to *collect* . . . the sums against said municipalities . . . ." (emphasis supplied)

Such *collection* is from the persons who are the *owners of estates* situated within the several municipalities.

Thus, relative to the State property tax, the plaintiff municipalities have a judicially cognizable interest in the present litigation only by virtue of their status as *collectors,* for the State, of the State property tax subject, in such capacity, to penalty should they be delinquent in paying to the Treasurer of State the State property tax

---

10. No claim has here been asserted by the plaintiff municipalities that this litigation involves any monies paid as taxes by said municipalities upon property owned by the municipalities and not devoted to public uses, thus to be outside the exemption from taxation established by 36 M.R.S.A. § 651.

proceeds which they have collected for the State.[11]

■ Insofar as the monies deposited with the escrow agent are proceeds of the State property tax which the plaintiff municipalities collected in their capacities as agents for the State, and, as such agents, have statutory responsibility to pay over to the Treasurer of State, that the State property tax, as the source of the monies, might be an unconstitutional tax would not be legal justification for the municipalities, as collecting agents for the State, to withhold the monies from their principal.

We have decided, ante, that since plaintiffs Walter S. Reed, Jr., and E. Ward Logan had voluntarily paid the State property tax laid against their respective estates in Boothbay Harbor, they have no right to a refund of the taxes paid even if it should eventuate that they were unconstitutionally levied. Similarly, all other owners of estates in the several plaintiff municipalities from whom said municipalities have already collected the State property tax have no right to a refund of the State property taxes already paid by them.

■ Since the instant litigation cannot produce for the owners of estates who have paid the State property tax an adjudication entitling them to a refund of the monies paid, either in whole or in part, were the several plaintiff municipalities to undertake to make such refunds from the monies already collected, the municipalities would be making entirely gratuitous gifts of the monies produced by a *State* tax. In the absence of a statute authorizing such refunds as a matter of the State's grace, such action by the municipalities would be unlawful.

Because the plaintiff municipalities would thus have no justification to withhold the escrow monies from the Treasurer of State on the grounds that said monies should be paid back to the owners of the estates from whom the municipalities collected the monies, the ultimate posture of the instant litigation is that the plaintiff municipalities must be taken to be claiming that the unconstitutionality of the State property tax justifies their refusal to pay the monies to the Treasurer of State because it entitles them to keep the monies for themselves; and that this remains true notwithstanding that said monies are (1) the proceeds of a property tax levied by the State as the sovereign; (2) the State as sovereign asserts itself entitled to said proceeds; and (3) the municipalities came into possession of the monies solely as agents authorized to collect for the State as the principal.

■ This claim of the plaintiff municipalities fails as a matter of law. To resist lowering the standard of moral honesty by which fiduciaries must be governed, the conventional law of agency adheres to the principle that illegality in the underlying transaction pursuant to which monies come into the hands of an agent for his principal does not authorize the agent to disavow obligation to remit to the principal and to claim the monies for himself. *Schultz v. Hinshaw*, 20 Ariz.App. 524, 514 P.2d 277 (1973); *Restatement, Second,* Agency § 412(1). This principle must be held controlling, a fortiori, when, as here, we are concerned with municipalities as governmental subdivisions of the sovereign which are charged by the sovereign to act, governmentally, as agents on behalf of the sovereign to collect a tax which the sovereign has levied to fulfill its own purposes. It thus eventuates that even if the State property tax were to be held unconstitutional in this litigation, such

---

11. Section 8 of Chapter 556, P.L.1973 added to 36 M.R.S.A. a new Section 891-A prescribing the penalty that so long as a municipality is delinquent in making payments to the Treasurer of State required of it, such municipality may be " . . . precluded from drawing from the Treasurer of State the school subsidy set apart . . ." for it.

interests as the plaintiff municipalities may legitimately here assert as deserving of protection remain legally unaffected. The complaint of the plaintiff municipalities must, therefore, be dismissed because the claim it purports to state fails, as a matter of law, to constitute a claim warranting relief.

The entry is:

(1) As to all plaintiffs the complaint must be dismissed.

(2) Case remanded to the Superior Court for entry of judgment accordingly.

All Justices concurring.

DELAHANTY, J., sat at argument but did not participate further in the case.